2023 IL App (2d) 220414
No. 2-22-0414
Opinion filed December 19, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 20-CF-160 |
| FRANK E. RYAN, | ) ) ) | Honorable David P. Kliment, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE MULLEN delivered the judgment of the court, with opinion.
Justices Jorgensen and Birkett concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a bench trial in the circuit court of Kane County, defendant, Frank E. Ryan, was found guilty of two counts of attempted first degree murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2020)) based on evidence that he rerouted a natural gas line into the home of Richard Rittgarn, while Rittgarn and his son were sleeping. Defendant was sentenced to concurrent six-year prison terms. Defendant argues on appeal that the State failed to prove beyond a reasonable doubt that he acted with the intent to kill. Defendant alternatively argues that the trial court erred in requiring him to be shackled during trial. We affirm.

¶ 2                                I. BACKGROUND

¶ 3    Kelsey Pranaitis married Rittgarn in 2021. Before then, Kelsey had been in a relationship with defendant from 2012 to late 2019, at which point she began, or was already in, a relationship with Rittgarn. In the early morning of January 19, 2020, Rittgarn and his son were asleep on the second floor of Rittgarn's house in Elburn. Rittgarn awoke at about 2:15 a.m. to the smell of natural gas. Rittgarn fell asleep again but reawoke, still smelling gas. Rittgarn discovered that gas was flowing into the house from tubing that was run through a hole in the outside wall of his first-floor office. Rittgarn used a pen to plug the opening of the tubing. Rittgarn went outside to the gas meter and discovered that tubing had been crudely attached to the natural gas line with clamps and a block of wood. The tubing had been fed into the house. After pulling the tubing out of the house, Rittgarn called 911. Rittgarn noticed that his Ring doorbell camera had been covered with duct tape.

¶ 4    Michael Huneke, the duty chief with the Elburn and Countryside Fire Protection District, testified that he arrived at the scene at 2:27 a.m., at which point he turned off the gas. Lieutenant Matt Linden also responded to the 911 call, arriving at the scene at about 2:30 a.m. After the gas was turned off, firefighters entered the house with equipment to measure the level of natural gas inside. They determined the level was 2 to 3% on the first floor and 2% upstairs. Linden testified that he had never heard of a higher gas level in a home. Huneke further testified that the methane in natural gas becomes explosive at a level of 5% if exposed to an ignition source. If an explosion had occurred in Rittgarn's house, the damage would have been catastrophic and Huneke would not have expected any house occupants to survive. Huneke also testified that natural gas is an asphyxiant.

¶ 5    John Shepard, a detective with the Elburn Police Department, investigated the incident. Shepard testified that the tubing used to pipe the gas into the house had sequential foot markers.

The police found a spool of the same tubing at a hardware store in Sugar Grove. The tubing had been cut at the marker next in the sequence of markers on the tubing found at Rittgarn's home. Surveillance video from the store showed defendant purchasing the tubing. A receipt from the transaction also showed defendant purchasing, *inter alia*, duct tape and a 12-inch drill bit.

¶ 6 Shepard and Commander Brandon McKiness of the Kane County Sheriff's Office conducted a video-recorded interview with defendant, which was admitted into evidence. During the interview, defendant indicated that, in November 2019, he learned that Kelsey was having an affair with Rittgarn. Defendant initially indicated that the items he purchased at the hardware store were for use at his home and that he would be shocked to learn that they had been found at Rittgarn's home. Defendant showed the officers data from his Fitbit showing that he was asleep at the time of the incident. Eventually, however, defendant admitted that he attached the tubing to the gas line at Rittgarn's house and fed it into the house through a hole he drilled in the wall. Defendant indicated that he intended only to scare the occupants of the house. He explained that he lent his Fitbit to his father so that it would appear to show that defendant was sleeping at the time of the incident. Defendant arrived at Rittgarn's house at about 1 a.m. and was there for about 40 minutes. He admitted covering the doorbell camera with duct tape. Defendant did research on whether natural gas would rise or fall. Defendant wanted the gas to rise so that the upstairs occupants would smell the gas odor. When asked about the possibility that a spark might ignite the gas, defendant responded that he knew the Rittgarns got up at about 5 a.m. and that not enough gas would have accumulated by then to cause an explosion. He explained that, in every story he had heard about homes with gas leaks, it took a day or two before "something happen[ed]." Defendant also indicated that he did not think an explosion would occur, because, at the connection

between the gas line and the tubing, the tubing was "shooting gas out through everything," including toward the ground, and thus would probably not pump any gas into the house.

¶ 7     McKiness testified that defendant gave the impression during the interview that he believed that the smell of the gas would wake the house's occupants and they would leave.

¶ 8     After the trial court found him guilty of attempted first degree murder, defendant filed a posttrial motion. The court denied the motion. Following his sentencing, defendant filed this timely appeal.

¶ 9                                   II. ANALYSIS

¶ 10                          A. Sufficiency of the Evidence

¶ 11     Defendant first argues that the State failed to prove his guilt beyond a reasonable doubt. A reviewing court will not set aside a criminal conviction unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). When the sufficiency of the evidence is challenged, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "[A] reviewing court will not substitute its judgment for that of the trier of fact on issues involving the weight of evidence or the credibility of witnesses." *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224-25 (2009).

¶ 12     Section 8-4(a) of the Criminal Code of 2012 (Code) (720 ILC 5/8-4(a) (West 2020)) provides, "A person commits the offense of attempt when, *with intent to commit a specific offense*, he or she does any act that constitutes a substantial step toward the commission of that offense." (Emphasis added.) Under section 4-4 of the Code (*id.* § 4-4), "[a] person intends, or acts intentionally or with intent, to accomplish a result or engage in conduct described by the statute

defining the offense, when his conscious objective or purpose is to accomplish that result or engage in that conduct." In *People v. Petermon*, 2014 IL App (1st) 113536, ¶ 39, the court observed that, "[t]o support a conviction for attempted murder, the State must establish beyond a reasonable doubt that: (1) the defendant performed an act constituting a 'substantial step' toward the commission of murder, and (2) the defendant possessed the criminal intent to kill the victim." Intent to kill "may be inferred when it has been demonstrated that the defendant voluntarily and willingly committed an act, the natural tendency of which is to destroy another's life." (Internal quotation marks omitted.) *Id.* In *Petermon*, where the defendant shot, but did not kill, another individual, the court affirmed the defendant's attempted murder conviction, noting that "an intent to kill may be proven where the surrounding circumstances show that the defendant fir[ed] *** a gun at or towards another person with either malice or a total disregard for human life." (Internal quotation marks omitted.) *Id.* ¶¶ 39, 44. We see no reason to limit this principle to cases involving firearms, as opposed to other dangerous instrumentalities. Hence, proof that a defendant committed potentially lethal acts with a total disregard for human life is sufficient to establish the intent element of the offense of attempted first degree murder.

¶ 13    With these principles in mind, we consider defendant's argument that the State failed to prove he acted with the requisite intent to kill the occupants of the home. Defendant argues that the State failed to prove he intended anything other than scaring the occupants. Although that is what defendant told the police, the trial court was under no obligation to believe defendant's self-serving statements that were not made under oath.

¶ 14    Defendant also points out that there is no evidence that he knew natural gas is an asphyxiant. However, it is a matter of common knowledge that natural gas is an asphyxiant, and it was reasonable for the trial court to infer that defendant would have been aware of that fact.

Moreover, there is no question that a home filled with natural gas poses a serious danger of a lethal explosion. Defendant admitted that he was aware of this danger, although he told police that, in the accounts of gas leaks he had heard about, it took days before "something happen[ed]." Defendant claims that "no evidence contradicted his stated belief that this gas leak would not cause an explosion before the occupants woke up and noticed the odor." The argument is unpersuasive. Again, the trial court was not obligated to credit defendant's self-serving statements to the police. Moreover, there is a difference between a gas leak (which might be small enough to allow only a slow buildup) and tubing placed deliberately to allow gas to flow freely into a house. It is entirely reasonable to infer that defendant would have understood this, notwithstanding his claims to the contrary.

¶ 15    Defendant points out that he knew the gas would rise, "making it more likely the occupants would notice the gas before it became dangerous." However, defendant routed the gas into the home in the early morning hours when the occupants were sleeping. There is no evidence suggesting that defendant had any reason to believe that the occupants would notice the gas before they awoke at their usual time. Although Rittgarn did, in fact, wake up early and notice the odor of gas, that appears to have been purely fortuitous. There is no evidence that defendant could have anticipated that Rittgarn would not continue sleeping (as his son did) while gas filled the house. Although defendant notes that there was evidence that a person can smell a small quantity of natural gas, there was no evidence that the smell would necessarily wake a person from sleep.

¶ 16    Defendant stresses that he believed the house's occupants generally woke up at about 5 a.m., so the gas would flow for only a few hours before it was detected. However, the evidence shows that defendant rerouted the natural gas line into the house sometime between 1 and 2 a.m. By 2:30 a.m., the gas level was about 2 or 3%. At a level of 5%, an explosion could have occurred.

Even assuming the gas would have continued to flow until no later than 5 a.m., it seems likely that it would have reached the 5% level, creating a risk of a deadly explosion.

¶ 17    In support of his argument that he intended only to scare the occupants of the house, defendant notes that an explosion would require an ignition source and that he did not supply one. However, it is not clear that defendant had any practical way of supplying an ignition source. Rather, it is reasonable to conclude that defendant was relying on a spark from static electricity or an electronic device to ignite an explosion. In any event, the possibility that a spark would ignite the gas is enough to establish that defendant's acts had a natural tendency to destroy another's life and that he showed, at best, a total disregard for the lives of the house's occupants.

¶ 18    The trier of fact is not required to abandon common sense when assessing a criminal defendant's mental state. It was a matter of sheer luck that Rittgarn and his son did not die of asphyxiation or an explosion from the natural gas defendant diverted directly into their home while they slept. The suggestion that defendant was unaware of the magnitude of the danger of his actions strains credulity. The evidence of intent was not merely sufficient but overwhelming.

¶ 19                                B. Shackling of Defendant During Trial

¶ 20    Defendant argues that the trial court erred by failing to hold a hearing or make findings on whether it was necessary to shackle him during trial. According to defendant, the trial court "abdicat[ed] [its] responsibilities" by accepting the opinion of court security and not making its own determination on the need for restraints.

¶ 21    Physical restraints affect several interests, including the defendant's presumption of innocence, the ability to assist counsel, and the dignity of the court proceedings. *People v. Reese*, 2017 IL 120011, ¶ 51. Moreover, "[t]here can be no doubt that shackles impose physical burdens, pains, and restraints that tend to confuse and embarrass a defendant, burden his mental faculties

and thereby materially abridge and prejudicially affect his constitutional rights." *People v. Rippatoe*, 408 Ill. App. 3d 1061, 1067 (2011). Accordingly, in *People v. Boose*, 66 Ill. 2d 261, 266 (1977), our supreme court held as follows:

"A defendant may be shackled when there is reason to believe that he may try to escape or that he may pose a threat to the safety of people in the courtroom or if it is necessary to maintain order during the trial. [Citations.] The determination is left to the discretion of the trial judge, and he may select the physical restraints most suitable in light of all the circumstances. [Citation.] The trial judge should state for the record his reasons for allowing the defendant to remain shackled, and he should give the defendant's attorney an opportunity to present reasons why the defendant should not be shackled. These proceedings should take place outside the presence of the jury. [Citations.]"

*Boose* identified various factors that are germane to the determination of whether a defendant may be placed in restraints during trial.

¶ 22    Illinois Supreme Court Rule 430 (eff. July 1, 2010), which codified *Boose*, provides as follows:

"An accused shall not be placed in restraint of any form unless there is a manifest need for restraint to protect the security of the court, the proceedings, or to prevent escape. Persons charged with a criminal offense are presumed innocent until otherwise proven guilty and are entitled to participate in their defense as free persons before the jury or bench. Any deviation from this right shall be based on evidence specifically considered by the trial court on a case-by-case basis. The determination of whether to impose a physical restraint shall be limited to trial proceedings in which the defendant's innocence or guilt is to be determined, and does not apply to bond hearings or other instances where the

defendant may be required to appear before the court prior to a trial being commenced. Once the trial judge becomes aware of restraints, prior to allowing the defendant to appear before the jury, he or she shall conduct a separate hearing on the record to investigate the need for such restraints. At such hearing, the trial court shall consider and shall make specific findings as to:

(1) the seriousness of the present charge against the defendant;

(2) defendant's temperament and character known to the trial court either by observation or by the testimony of witnesses;

(3) defendant's age and physical attributes;

(4) defendant's past criminal record and, more particularly, whether such record contains crimes of violence;

(5) defendant's past escapes, attempted escapes, or evidence of any present plan to escape;

(6) evidence of any threats made by defendant to harm others, cause a disturbance, or to be self-destructive;

(7) evidence of any risk of mob violence or of attempted revenge by others;

(8) evidence of any possibility of any attempt to rescue the defendant by others;

(9) size and mood of the audience;

(10) physical security of the courtroom, including the number of entrances and exits, the number of guards necessary to provide security, and the adequacy and availability of alternative security arrangements.

> After allowing the defendant to be heard and after making specific findings, the trial judge shall balance these findings and impose the use of a restraint only where the need for restraint outweighs the defendant's right to be free from restraint."

Moreover, we have specifically held that a trial court errs when it simply defers to security personnel and does not exercise its independent discretion in deciding the need for restraints. *In re Mark P.*, 402 Ill. App. 3d 173, 177 (2010).

¶ 23 At the beginning of the second day of trial, just before McKiness's testimony, defendant's attorney advised the trial court that "[defendant] would like to have one arm free to take notes with me. I don't know if that's a possibility. There is [*sic*] not many people in the courtroom." The court replied, "[t]hat's up to security. I think they need a second person here for that." Thus, the court denied counsel's request that defendant be partly unshackled.

¶ 24 The State argues that defendant failed to object sufficiently to the use of restraints. Quoting *Mark P.*, the State asserts that, "[w]here an attorney merely objects to handcuffing 'without requesting that the trial court enunciate its rationale or its independent judgment,' the issue of restraint is forfeited." *Id.* at 179. The State misunderstands the scope and underlying rationale of the forfeiture in *Mark P.*

¶ 25 *Mark P.* was a civil proceeding for involuntary commitment under the Mental Health and Developmental Disabilities Code (405 ILCS 5/1-100 *et seq.* (West 2008)). At the time of the trial court proceedings in *Mark P.*, Rule 430 had not yet taken effect. See *Mark P.*, 402 Ill. App. 3d at 175. Moreover, we observed that

> "there is no precedent as to whether a *Boose* hearing is appropriate in a civil proceeding of this type, held in an essentially closed courtroom without a jury and, further, before a judge

who has expressed in open court that the handcuffs would have no effect on his judgment of the merits." *Id.* at 176.

The respondent's attorney in *Mark P.* vehemently objected to the respondent being restrained during the proceedings, but counsel did not request a hearing under *Boose*. *Id.* at 174, 177. Rather than make an independent determination of the need to restrain the respondent, the trial court simply deferred to security personnel. *Id.* We held that, by failing to request a *Boose* hearing, the respondent failed to preserve the question of whether such a hearing was required in the respondent's case. *Id.* at 177.

¶ 26    Unlike in *Mark P.*, both *Boose* and Rule 430 (which codified *Boose*) clearly apply to this proceeding. Thus, in contrast to the respondent in *Mark P.*, defendant is not asking us to consider an unsettled question of law that was not raised in the trial court. Moreover, given that Rule 430 was not even in effect during the trial court proceedings in *Mark P.*, our decision there has no bearing on whether a defendant must specifically request a hearing under that rule. Contrary to the State's position, Rule 430 makes it abundantly clear that, once apprised that a defendant has been placed in restraints, it is the trial court's responsibility to conduct a hearing on the need for restraints. Nothing in the rule's language requires the defendant to request a hearing. A court that blithely ignores that requirement in deference to security personnel risks depriving the defendant of a fair trial.

¶ 27    *In re Benny M.*, 2017 IL 120133, cited by the State, does not alter our conclusion. That case involved the use of restraints during a hearing on a petition to administer psychotropic medication without the respondent's consent. *Id.* ¶¶ 3, 6-8, 23. The respondent's attorney objected in the trial court to the use of restraints but did not request either an opportunity to be heard or specific findings from the trial court pursuant to *Boose*. *Id.* ¶¶ 6-7, 45. The *Benny M.* court held

that "a more specific objection was required to preserve respondent's *procedural* arguments for review *given that the procedure for allowing restraints in involuntary treatment proceedings was not established at the time of the hearing in this case.*" (Emphases added.) *Id.* ¶ 45. This reasoning does not apply here, because the procedure for allowing restraints in criminal trials was well settled at the time of defendant's trial.[1]

¶ 28     We also stress that the scope of the forfeitures in both *Mark P.* and *Benny M.* was limited to *procedural* issues. In each case, the court reviewed the merits of the respondent's arguments that the trial court erred by deferring to security personnel. *Id.* ¶ 26, 39; *Mark P.*, 402 Ill. App. 3d at 177. In *Benny M.*, the court concluded that the trial court did, in fact, make an independent determination. *Benny M.*, 2017 IL 120133, ¶¶ 39-41. In *Mark P.*, we concluded that the trial court improperly deferred to security personnel, but we found the error to be harmless because (1) the trial court assured the respondent that his appearance in restraints would not affect the court's decision, (2) the restraints could not have affected the respondent's ability to participate in the hearing, and (3) the evidence "clearly established the need for respondent's institutionalization." *Mark P.*, 402 Ill. App. 3d at 178-79.

¶ 29     Here, as in *Mark P.*, the trial court failed to make an independent determination of the need to place defendant in restraints. Instead, the trial court unequivocally deferred to security

---

[1]We note that, in his posttrial motion, defendant did not challenge the use of restraints. Ordinarily, to preserve an issue for appellate review, the defendant must make a contemporaneous objection *and* raise the issue in his or her posttrial motion. *People v. Guerrero*, 2021 IL App (2d) 190364, ¶ 60. However, the failure to raise in a posttrial motion an objection to the use of restraints at trial does not forfeit appellate review. *People v. Shafer*, 2020 IL App (4th) 180343, ¶ 60.

personnel. Doing so was clearly error subject to review under both *Mark P.* and *Benny M.* Nonetheless, we conclude that the error was harmless. To establish that the error in placing defendant in restraints was harmless, "[t]he State must prove beyond a reasonable doubt that the [shackling] error complained of did not contribute to the verdict obtained." (Internal quotation marks omitted.) *Reese*, 2017 IL 120011, ¶ 50. Here, because the evidence against defendant was overwhelming, we cannot see how the outcome would have been any different if the restraints had been removed during trial. Accordingly, the use of restraints on defendant is not grounds for a new trial.

¶ 30                                    III. CONCLUSION

¶ 31     For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 32     Affirmed.

---

*People v. Ryan*, **2023 IL App (2d) 220414**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Kane County, No. 20-CF-160; the Hon. David P. Kliment, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Gilbert C. Lenz, of DePaul University Legal Clinic (Sarah Van Pelt, law student), of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Jamie L. Mosser, State's Attorney, of St. Charles (Patrick Delfino, Edward R. Psenicka, and Max C. Boose, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

---