NOTICE

Decision filed 02/15/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 220100-U

NO. 5-22-0100

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Pope County. |
| | ) | |
| v. | ) | No. 21-CF-16 |
| | ) | |
| JUSTIN TURNER, | ) | Honorable |
| | ) | Joseph M. Leberman, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE McHANEY delivered the judgment of the court.
Justices Moore and Barberis concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The trial court's judgment is affirmed where the evidence was sufficient to prove defendant guilty; defendant entered the homeowner's barn with the requisite intent; defendant received effective assistance of counsel; defendant's sentence for attempted murder was proper where no mitigating circumstances were present; and defendant's sentence was not excessive.

¶ 2   Following a bench trial, the defendant, Justin Turner, was convicted on charges of attempted first degree murder (720 ILCS 5/8-4(a), 9-1(a)(2) (West 2020)), burglary (*id.* § 19-1(a)), and possession of a stolen motor vehicle (625 ILCS 5/4-103(a)(1) (West 2020)). He received a 40-year sentence for the charge of attempted murder, to be served at 85%, plus 3 years of mandatory supervised release (MSR). He also received concurrent 5-year sentences, with a 12-month term of MSR, for the charge of burglary, to be served at 50%, and possession of a stolen motor vehicle. Prior to trial, the defendant's trial counsel filed an affirmative defense of self-defense to the charges

1

of attempted murder, aggravated battery, and aggravated discharge of a firearm. Trial counsel also filed an affirmative defense of "compulsion" to the charge of possession of a stolen motor vehicle but did not file an affirmative defense to the burglary charge. On appeal, the defendant argues the State failed to prove he did not act in self-defense; failed to prove he entered the homeowner's barn with intent to commit a felony therein; he was denied effective assistance of counsel; his punishment for attempted first degree murder is unconstitutional; and finally, his sentence for attempted first degree murder was excessive and must be vacated where he acted under "serious provocation." For the reasons that follow, we affirm the defendant's convictions and sentence.

¶ 3                                    I. Background

¶ 4      On August 9, 2021, at the start of the bench trial, the parties waived opening statements. Evidence adduced at trial revealed that on April 24, 2021, Xennia Gruszczyk went outside to walk the dogs and feed the goats when she heard noises coming from near one of the barns. Xennia saw a man getting out of her husband's truck. She ran to the house and told her husband Harry to get his gun because there was a strange man on their property. Xennia called the police and then called two neighbors, Carl "Butch" Hart and Jack Trenary.

¶ 5      Harry was lying on the couch in his T-shirt and underwear because he had not been feeling well. When his wife came back into the house, she was frantic and told Harry there was a man on their property. Without taking time to get dressed, Harry grabbed a pistol and ran outside. He saw the door to his truck was wide open and then saw a man, who Harry identified at trial as the defendant, coming towards him. From a distance Harry told the defendant to stop, but the defendant continued to approach. When the defendant was about 25 feet away, Harry pointed his pistol at the defendant and told him that if he did not stop, Harry would shoot him. The defendant repeatedly told Harry, "You don't want to do this." Harry testified that he was extremely afraid

2

and felt that he "was in big trouble." As the defendant kept stepping towards him, Harry kept stepping backwards, trying to keep a distance of 30 feet between them because Harry was afraid that the defendant was going to run at him. Harry was also trying to stay between his wife and the defendant. Harry yelled for his wife to call the police.

¶ 6    After calling the police, Xennia stepped outside to watch the confrontation. According to Xennia, the men were close, although she could not state the distance between them, and she could not hear what they were saying. She saw Harry pointing his gun at the trespasser, who was pacing back and forth and occasionally turning around. Xennia testified that at some point Harry fired a warning shot into the air prompting the trespasser to sit down for a few seconds. Eventually Xennia lost sight of Harry and the defendant, but she then heard a shot and heard Harry yell that he had been hit. She called 9-1-1 to request an ambulance and ran back out to Harry. Their neighbor Jack had arrived, and they "huddled" next to Harry, who had been shot on the right side of his body.

¶ 7    Although there was no testimony as to how long the interaction lasted, Harry and the defendant engaged in conversation. Harry testified that at one point while waiting for the police to arrive, he called the defendant a thief. The defendant responded that if he was a thief, he would have stolen "[t]he tools, the four-wheeler, the welder, the Kawasaki Mule." Upon hearing the defendant mention those specific items, Harry believed that the defendant already had been inside the barn where Harry kept those items. This made Harry "extremely worried" that the defendant also had found the 20-gauge shotgun kept inside the barn. Harry kept the unloaded shotgun in the southwest corner of the barn. He kept a box of different types of ammunition for the shotgun on a shelf about four or five feet from the shotgun.

¶ 8    The defendant asked Harry if he could take a smoke. Harry was trying to buy time for the police to arrive, so he told the defendant he could smoke. The defendant briefly stopped and took

3

several puffs from his vaping device. Harry testified that after taking those puffs, the defendant's demeanor changed. The defendant "showed no fear," turned his back to Harry, and started walking towards the barn. At that point, Harry fired a warning shot into the ground off to his right-hand side to keep defendant from going into the barn. Harry testified that he did not point the gun at the defendant, nor did he fire the warning shot in front of the defendant. Instead, Harry fired the warning shot off to his right-hand side and into the ground, attempting to keep the bullet from the warning shot approximately 30 feet away from defendant. After Harry fired the warning shot, the defendant momentarily stopped, but then continued to walk toward the barn. The defendant told Harry that if he shot him in the back, Harry would be charged with murder.

¶ 9    After the defendant entered the northeast corner of the barn, Harry took off running, but he did not turn his back completely to the defendant; rather, he was more at a 90-degree angle. Harry testified that mere seconds after the defendant entered the barn, as Harry was running away, the defendant shot him in his right side with the shotgun that was kept inside the barn. Harry still had his pistol in his hand as he was running away.

¶ 10    After being shot, Harry yelled to Xennia to call an ambulance. He went to the end of the driveway and laid down in the grass. At some point Harry saw a police car drive by and attempted to get the police car to stop by firing two shots into the ground, but the police vehicle did not stop.

¶ 11    Harry testified that as he was lying on the ground, he heard his four-wheeler start up in the barn. Harry then saw the defendant drive the four-wheeler around the corner of the barn heading straight towards him. Although Harry was near the easiest exit off his property, he believed that the defendant was coming straight at him to kill him because the defendant could have gone any other direction. At that point, Harry used his left hand to fire the last three shots in his gun at the defendant. The defendant swerved the four-wheeler and then headed behind the house to the west.

4

¶ 12     While Harry was still lying on the grass, he once again saw the defendant on the four-wheeler heading in his direction. The defendant slowed the four-wheeler and made eye contact with him. At that time, Harry's neighbor, Butch, fired a couple shots in the defendant's direction, and the defendant sped away. When Butch asked Harry if he should chase the defendant, Harry told him no and asked him to stay with him because he believed the defendant was trying to kill him.

¶ 13     When police arrived at the scene, Harry told Deputy Josh Wright that he had been shot by the defendant with a 20-gauge shotgun that Harry kept in his barn. Deputy Wright had been informed by dispatch that the defendant was traveling east on a blue four-wheeler. After providing some medical care to Harry, the deputy left to look for the defendant.

¶ 14     Deputy Wright followed four-wheeler tracks which turned onto a dead-end side road, where the deputy saw a maroon minivan parked off the side of the road with a rope attached to its front end. The deputy saw the defendant sitting on a blue four-wheeler next to the minivan. The four-wheeler matched the description of the four-wheeler taken from Harry's property. The deputy testified that the defendant was crouched over like he was trying to hide.

¶ 15     Deputy Wright testified, without objection, that the defendant told him he had gotten his minivan stuck and went to Harry's residence in hopes of retrieving a rope or a chain to get his minivan unstuck. The defendant claimed that when Harry came out, he pulled out a pistol and shot twice at the defendant, prompting him to run away. The defendant was placed under arrest. The police searched the defendant and found two knives, three vape pens, a cell phone, brass knuckles, a flashlight, and a wallet inside the pockets of his clothing. On redirect-examination, Deputy Wright testified that the defendant did not claim to have knocked on Harry's door nor did he claim to have called anyone to help him with his minivan.

5

¶ 16    Deputy Wright testified that he drove the defendant back to Harry's property to be identified by a witness. After the defendant was positively identified, Deputy Wright transported him to the sheriff's department where the defendant was "read his rights" by Sheriff Suits. When asked by the prosecutor if the defendant had agreed to an interview, Deputy Wright stated he did not and instead he asked for a lawyer. Trial counsel did not object to this testimony.

¶ 17    Carl "Butch" Hart testified at trial that Xennia called him on April 24, 2021, asking for assistance because an intruder was at their home. When he arrived at approximately 5 p.m., he found Harry lying in a ditch with a gunshot wound to his chest. He heard Harry say, "He's coming back," and observed the defendant drive by on a four-wheeler. Butch, armed with a 9-millimeter pistol, shot a few times at the tires as the defendant drove past, but he failed to hit them. When the police arrived, Butch told them the direction he had seen the defendant heading.

¶ 18    Deputy Keith Smith testified that he arrived at the scene as Harry was being loaded into an ambulance. After securing the scene, Deputy Smith discovered a shotgun lying in the grass between Harry's barn and the driveway. There were four-wheeler tracks going through the area where the shotgun was found. Deputy Smith later learned that Harry's neighbor, Jack, had removed Harry's pistol from the scene. A few days later, the deputy obtained the .22-caliber gun and placed it in an evidence locker. The pistol had "five or six" empty rounds in it.

¶ 19    Trooper Todd Kuczynski later investigated the crime scene and collected evidence. Trooper Kuczynski recovered a Harrington & Richardson single shot shotgun found in Harry's yard between the residence and the barn. Harry subsequently identified it as the same shotgun he kept in the barn. The recovered shotgun contained one live 20-gauge shell in its chamber. The trooper also recovered a fired shotgun hull between two of the farm buildings.

¶ 20    Harry's wife, Xennia, had worked as a nurse for 15 years in the intensive care unit. She testified that Harry was transported by ambulance to a hospital in Paducah, Kentucky. After x-rays and CT scans were taken, hospital personnel told them that due to the extent of his injuries, Harry would have to be transferred to another hospital. Because of poor weather, they could not fly Harry to a hospital in St. Louis or Nashville. Instead, Harry was transported by medical helicopter to a hospital in Evansville, Indiana. Xennia testified that she initially asked about having Harry transferred to a hospital close to where they lived but that she did not want to risk Harry's life for her convenience.

¶ 21    Sheriff Jerry Suits was able to briefly visit Harry before he was transferred. At trial, Sheriff Suits described the nature of Harry's injuries:

> "He was in the emergency room. He wasn't in good shape. I was talking to a nurse by the name of Bailey, asked her, how is he doing, and immediately she told me, he's got several gunshot wounds to his body. At that point I got to look at him and wanting to talk to him and he had his shirt off and we pulled the sheet down and his whole total chest either had what I thought was a bullet, bullets in his chest, bullet wounds. Also, he's already starting to bruise up, had a lot of blood that he was sitting on that Nurse Bailey told me that came from those wounds. He was pretty upset, he was nervous, you know, I did talk to him for a few minutes trying to get a good feel from him you know what happened, and you know the nursing staff, they was trying to get him in a helicopter to get him moved to Evansville hospital to a trauma center, so you know I was able to talk to him for a couple of minutes."

Sheriff Suits testified, without objection, that the medical staff at the hospital believed that Harry's injuries were "life threatening."

¶ 22    When asked by the State who advised the defendant of his rights once he arrived at the sheriff's department, Sheriff Suits stated that he had. The sheriff testified that the defendant indicated he understood his rights, agreed to a tape-recorded interview, and signed a form waiving his constitutional rights. Although the defendant initially told Sheriff Suits he did not want a lawyer, almost immediately after the interview began, the defendant told the sheriff that he wanted a lawyer, after which he was removed from the interview room and transported to the county detention center.

¶ 23    After Harry was transferred to the Indiana hospital, he spent the first day in the trauma intensive care unit. He was treated at the hospital for four days. Harry had sustained multiple shotgun pellet wounds in his right upper arm, left forearm and hand, and down his right side into his leg. In addition, Harry had pellet injuries behind his right ear. The medical team decided not to remove any of the shotgun pellets from Harry's body. At the time of trial, Harry still had approximately 36 pellets lodged in his right upper chest, and 12 pellets lodged in his left hand. Harry testified that his left palm was still numb, and his little finger was tingly. In addition to Harry's testimony, the State admitted into evidence eight photographs documenting Harry's injuries the night he was shot.

¶ 24    On cross-examination, Harry was asked about a statement he made to the sheriff at the hospital:

"Q. Did you tell the sheriff that you fired your weapon at [an] unknown subject?

A. After I was shot and laying on the ground, yes, I did."

Trial counsel did not introduce the sheriff's police report or ask any follow-up questions regarding this statement.

¶ 25    The only witness called on the defendant's behalf was Bill Gallamore, the tow truck driver who towed the defendant's van. Gallamore testified that the van was stuck approximately 15 feet off the edge of the road. The hood was raised, and there was a rope tied on the front of the vehicle.

¶ 26    At the close of the State's evidence, trial counsel stated, "Your Honor, I've discussed it with the defendant and we've decided to rest without calling any witnesses." The State reminded the trial court that the defendant had called Bill Gallamore, the tow truck driver, but did not have any rebuttal evidence. After the State reserved the right to make a closing argument after lunch, trial counsel told the court that the defendant would make a closing argument if the State did. After lunch the State waived closing argument, and trial counsel stated, "After discussing with the defendant, Your Honor, we will waive closing as well."

¶ 27    After a recess, the trial court found the defendant guilty on all counts.[1] As to the burglary charge, the trial court specifically found that the defendant had entered "that building with the intent to commit either theft over $300, which would be a felony, aggravated discharge of a firearm, or murder, each being a felony." As to the attempted murder charge, the trial court specifically found that the defendant performed a substantial step toward the killing of Harry and that he did so with the intent to kill Harry. As to the firearm enhancement, the trial court found that the State had met its burden to prove that the defendant personally discharged the firearm that proximately caused great bodily harm to Harry.

¶ 28    When the trial court asked the parties if they had any questions, trial counsel asked whether the trial court had considered the defendant's affirmative defenses that recently had been filed. The trial court stated it was unaware that affirmative defenses had been filed. After being made aware

---

[1]The trial court also found the defendant guilty of aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2020)) and aggravated battery with a firearm (*id.* § 12-3.05(e)(1)), but found that these charges merged into the attempted first degree murder charge.

of them, the trial court reviewed the affirmative defenses of self-defense and compulsion and found that neither affirmative defense changed the trial court's verdict. In a docket entry made the same day, the trial court found that the defendant used force that was intended or likely to cause death or great bodily harm and that he was not justified in the use of such force. The trial court further found that there was no imminent threat to the defendant at the time he shot Harry, who at the time was running away from the defendant.

¶ 29    Prior to sentencing, trial counsel filed a motion to withdraw, citing an irretrievable breakdown in the attorney-client relationship. During a hearing on the motion, trial counsel explained that the defendant wished to raise claims of ineffective assistance of counsel. The trial court held a "*Krankel* hearing,"[2] after which it appointed new counsel (successor counsel) to assist the defendant in litigating his claims.

¶ 30    After trial counsel withdrew, successor counsel filed a motion for a new trial alleging that trial counsel was ineffective for (1) failing to adequately argue self-defense at trial, (2) failing to find or examine Harry's revolver, (3) failing to call Jack Trenary as a witness, (4) failing to interview any of the other testifying witnesses before trial, (5) failing to object to the repeated use of a demonstrative exhibit, and (6) failing to make an opening statement or closing argument. The defendant alleged that although trial counsel filed the affirmative defenses of self-defense and compulsion, he did not pursue them at trial. At the hearing on the motion for new trial, the State contended that trial counsel had, in fact, "vigorously cross-examined" Harry, Xennia, and their neighbor Butch. The State further contended that trial counsel attempted to develop the theory of self-defense through his cross-examination of these witnesses. Following the hearing, the trial

_____

[2] *People v. Krankel*, 102 Ill. 2d 181 (1984).

court announced it would thoroughly review the trial transcripts as they related to the defense arguments.

¶ 31    On December 13, 2021, the trial court entered its order denying the defendant's motion for new trial. The trial court noted that on the first day of trial, the defendant was admonished that it was his decision as to whether to testify at the bench trial, and he elected not to testify. The trial court found that trial counsel's decision not to interview Harry's wife or his neighbor Butch was not ineffective assistance because nothing in their trial testimony supported or in any way bolstered the defendant's claims of self-defense or compulsion and both witnesses had been cross-examined at trial. The trial court concluded that trial counsel's decision not to call Jack as a witness was not ineffective assistance of counsel. Although there was trial testimony that Jack had removed Harry's pistol from the scene, this fact was never in dispute, and, thus, the possession or the location of Harry's gun did not bolster the defendant's claim of self-defense or compulsion. Additionally, the trial court found that at trial Harry was vigorously cross-examined by trial counsel about the first time he discharged his handgun. The trial court further found that the defendant did not present any new evidence at the motion hearing to support his claims of self-defense or compulsion that would have established that trial counsel was ineffective in his failure to enter such evidence at the bench trial. Thus, the trial court found that the defendant's trial counsel was not ineffective in his representation of the defendant and the defendant's sixth amendment right to counsel was not violated. The matter was set for sentencing.

¶ 32    The sentencing hearing was held on January 27, 2022. Harry testified that he continued to suffer physical pain and mental anguish as a result of the defendant's actions. He had approximately 60 shotgun pellets remaining in his body, including one lodged in his kidney. Physically, his palm was numb; he could not pick up a five-gallon bucket without difficulty; and

11

he experienced pain whenever he coughed or sneezed. Mentally, both he and his wife suffered from anxiety whenever they left their house, prompting them to install security cameras to monitor their surroundings.

¶ 33    The defendant made a statement in allocution. After expressing regret about how things turned out that day, the defendant stated, "I mean despite the findings of the Court, I believe that I did what I was—what was necessary to preserve my life and I did it without taking another person's life."

¶ 34    The State recommended a 50-year sentence. Successor counsel asserted that the evidence at trial showed that the defendant had been held at gunpoint by Harry for an indeterminate period of time and at least one warning shot had been fired in his general direction; thus, these factors should serve to mitigate the defendant's sentence. Successor counsel then recommended a "minimum" sentence, in part, because the defendant: (1) was acting in self-defense, (2) had been "honorably discharged" after serving four tours of duty in Iraq and Afghanistan, and (3) had a relatively minor criminal record.

¶ 35    After hearing the arguments of counsel, the trial court told the defendant that based on the evidence of Harry's injuries, he was lucky not to be facing a first degree murder charge. In pronouncing sentence, the trial court, in pertinent part, stated to the defendant:

> "I considered your statement in allocution. Some of the things you said I factor in. I think some of the things that you said are—that you have a sincere belief, but I do believe that belief is a bit misplaced in some, in some manner. But I don't doubt your sincerity. But it's your choices and your actions that have you here today.
>
> I have to consider and look at the fact, no matter—as I said no matter what your intentions, you were on someone else's property without permission, you entered a vehicle,

12

you entered buildings, and during this incident you had the opportunity to stop, but you didn't. It escalated, not because of what Mr. Gruszczyk did. He was on his property. You put yourself in that situation. That's an important factor to me. And then you went into a building for at least a second time, you grabbed a shotgun, you aimed it at Mr. Gruszczyk, and you pulled the trigger while he was fleeing. He was between buildings. You were at the other end of the building. That evidence is what I considered in determining this case at trial. And you have to be accountable for those actions."

¶ 36 After considering all relevant factors, the trial court reasoned that a minimum sentence would not be appropriate, but neither would it be appropriate to require a maximum sentence. On the charge of attempted murder, the defendant was sentenced to 15 years in the Illinois Department of Corrections with a 25-year firearm enhancement, to be served at 85%, and 3 years of MSR as well as concurrent 5-year sentences for burglary and possession of a stolen vehicle. Successor counsel did not file a motion to reconsider sentence, and the defendant filed a timely appeal.

¶ 37                                    II. Analysis

¶ 38 At the outset we address an overarching argument made by the defendant on appeal. The defendant contends that his conviction for attempted murder must be reversed because the trial court found that he was acting with a sincerely held but "misplaced" belief that shooting Harry was necessary to "preserve" his own life, thereby negating the *mens rea* requirement that he act with an intent to commit an unjustified killing. We are unpersuaded by the defendant's argument where the trial court's "finding" was a comment made in response to the defendant's statement in allocution as the court was pronouncing sentence.

¶ 39 Pursuant to section 5-4-1(a) of the Unified Code of Corrections (730 ILCS 5/5-4-1(a) (West 2020)), following a determination of guilt, the trial court shall hold a hearing to impose the

13

defendant's sentence. The statute further provides that the trial court shall afford the defendant an opportunity to make a statement on his own behalf. *Id.* § 5-4-1(a)(6). The purpose of the hearing as provided for by statute is not to determine the guilt or innocence of the defendant, but instead is intended to aid the trial court in determining the proper degree of punishment for a crime. *People v. Terry*, 12 Ill. 2d 56, 60 (1957); *People v. Johnson*, 28 Ill. 2d 531, 534 (1963).

¶ 40                                    A. Affirmative Defense of Self-Defense

¶ 41    The defendant's initial argument is that the State failed to prove that he did not act reasonably in self-defense when shooting Harry after Harry had pointed a gun at him and fired while his back was turned. The only testimony suggesting that the defendant acted in self-defense came from Deputy Wright who testified that the defendant told him he had gone to Harry's residence in hopes of retrieving a rope or a chain to get his minivan unstuck. The defendant told the deputy that when Harry came out of his house, Harry pulled out a pistol and shot at him so the defendant ran away. On appeal, the defendant maintains that he was acting reasonably in response to Harry's unlawful actions in threatening lethal force for a minor intrusion onto his property. The State contends that the defendant forfeited his claim of self-defense on appeal because he did not raise it at trial.

¶ 42    To preserve an issue for appellate review, a defendant must object to the alleged error when it occurs and raise the issue in a posttrial motion. *People v. Jackson*, 2022 IL 127256, ¶ 15. Prior to trial, defense counsel filed affirmative defenses of self-defense and compulsion. Although the trial court initially was not aware that they had been filed, defense counsel brought the matter to the court's attention. The trial court took the time to review the affirmative defenses immediately after it was made aware of them and determined that they did not change the verdict. Additionally,

14

the affirmative defenses were addressed in the defendant's motion for a new trial. We conclude that the defendant's claim was not forfeited.

¶ 43    "Self-defense is an affirmative defense, and once a defendant raises it, the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense, in addition to proving the elements of the charged offense." *People v. Lee*, 213 Ill. 2d 218, 224 (2004). "The elements of self-defense are: (1) that unlawful force was threatened against a person; (2) that the person threatened was not the aggressor; (3) that the danger of harm was imminent; (4) that the use of force was necessary; (5) that the person threatened actually and subjectively believed a danger existed that required the use of the force applied; and (6) the beliefs of the person threatened were objectively reasonable." *Id.* at 225. The defendant's claim of self-defense fails if the State negates any one of these elements. *Id.*

¶ 44    The trial court, as the trier of fact in a bench trial, "has discretion to reject a self-defense claim based on the probability or improbability of defendant's account, the circumstances of the crime, the testimony of the witnesses, and witness credibility." *People v. Brown*, 406 Ill. App. 3d 1068, 1081 (2011). A reviewing court must determine whether, after viewing all of the evidence in the light most favorable to the State, any rational trier of fact could have found beyond a reasonable doubt that the defendant did not act in self-defense. *Id.* However, a reviewing court will not substitute its judgment for that of the trier of fact on such matters. *People v. Brooks*, 187 Ill. 2d 91, 132 (1999).

¶ 45    Here, the trial court specifically rejected the defendant's claim of self-defense in finding there was no imminent threat to the defendant at the time he shot Harry. The evidence adduced at trial revealed that Harry had gunshot wounds to the right side of his body consistent with his testimony that he was shot as he was running away, but that he did not turn his back completely

on the defendant as he ran. Although on appeal the defendant spends a considerable amount of time arguing that, based on Harry's actions, he subjectively believed a danger existed that required his use of force, we need not consider that argument. All that was required for the defendant's claim of self-defense to fail was that the State negate one of the elements, which the trial court found it did.

¶ 46 Additionally, the defendant's actions after he shot Harry indicates a guilty state of mind and knowledge that he did not merely act in self-defense. See *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 59 (evidence of defendant's flight, as well as discarding of the weapon, is competent circumstantial evidence that refutes theory that defendant acted in self-defense). Accordingly, after viewing all of the evidence in the light most favorable to the State, we conclude that a rational trier of fact could have found beyond a reasonable doubt that the defendant did not act in self-defense where the danger of harm was not imminent.

¶ 47                                    B. Intent to Kill

¶ 48 The defendant does not dispute that he shot Harry; instead, he argues that the State failed to prove that he intended to kill Harry, as opposed to disabling him, when the defendant shot him in the side from a distance with a 20-gauge shotgun loaded with birdshot.

¶ 49 In determining whether there is sufficient evidence to convict, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *People v. Collins*, 106 Ill. 2d 237, 261 (1985). It is not the function of a reviewing court to retry the defendant or substitute its judgment for that of the finder of fact. *People v. Teague*, 2013 IL App (1st) 110349, ¶ 26. A reviewing court gives the State the benefit of all reasonable inferences. *People v. Wheeler*, 226 Ill. 2d 92, 116 (2007). A

16

defendant's conviction will be reversed only where the evidence is "so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of defendant's guilt." *Id.* at 115. It is the duty of the trier of fact to assess the credibility of the witnesses, assign the appropriate weight to testimony, and resolve discrepancies in the evidence. *People v. Evans*, 209 Ill. 2d 194, 211 (2004).

¶ 50    To prove a defendant guilty of attempted first degree murder, the State must prove: (1) that the defendant performed an act that constituted a substantial step toward committing a murder; and (2) that the defendant had the criminal intent to kill the victim. *Teague*, 2013 IL App (1st) 110349, ¶ 22. The question of a defendant's state of mind at the time of the crime is a question of fact to be determined by the trier of fact. *People v. Carlisle*, 2015 IL App (1st) 131144, ¶ 59. Mental states, such as an intent to kill, are not commonly established by direct evidence and may be inferred from the character of the defendant's conduct and the circumstances surrounding the commission of the offense. *Id.* The surrounding circumstances may include the character of the assault, the use of a deadly weapon, and the nature and extent of the victim's injuries. *Id.*

¶ 51    On appeal, the defendant maintains that based on his experience as a six-year combat veteran,[3] he chose to load Harry's shotgun with birdshot from the box of mixed ammunition which Harry kept near the shotgun because it was the least lethal ammunition with which to disable Harry so that the defendant could flee. The defendant attempts to downplay Harry's injuries by arguing that birdshot is less lethal than ordinary ammunition. However, the evidence reveals that after Harry was taken by ambulance to a local hospital, he was transported by helicopter to a hospital in Indiana where he spent the first day in the trauma intensive care unit. He was treated in the hospital for multiple shotgun pellet wounds for four days before being released. Although the defendant concedes that birdshot can be lethal, he cites cases from other states suggesting that

---

[3]There was no evidence presented at trial that the defendant was a combat veteran. This information was presented to the trial court at the defendant's sentencing hearing.

17

birdshot is less lethal than ordinary bullets. We do not find these cases persuasive, nor do we find the defendant's use of birdshot suggests he did not have the requisite intent to kill Harry.

¶ 52    Intent to kill may be inferred if one willfully does an act, the direct and natural tendency of which is to destroy another's life. *Id.* While the act of firing a gun itself is not sufficient to prove intent to kill (*People v. Ephraim*, 323 Ill. App. 3d 1097, 1110 (2001)), an intent to kill may be proven where the surrounding circumstances show that the defendant fired a gun at or towards another person with either malice or a total disregard for human life. *People v. Petermon*, 2014 IL App (1st) 113536, ¶ 39. "It falls to the trier of fact to determine if the requisite intent to kill existed, and that determination will not be disturbed on appeal unless there is a reasonable doubt as to defendant's guilt." *Id.*

¶ 53    Here, the surrounding circumstances were sufficient for the trial court to infer that the defendant fired the gun at Harry with intent to kill. Trial evidence demonstrated that (1) the defendant was trespassing on Harry's property and going through Harry's truck when he was discovered; (2) the defendant heard Harry tell his wife to call the police; (3) although Harry was pointing a pistol at him, the defendant continued to approach Harry, causing Harry to continue backing up in an effort to keep distance between them; (4) after the defendant revealed that he was aware of specific items which were kept in the barn, Harry worried that the defendant also had found his shotgun; (5) although Harry was still armed with a pistol, the defendant turned his back to Harry as he started walking towards the barn where Harry's shotgun was kept; (6) after Harry fired the warning shot, the defendant, who stopped briefly, continued walking towards the barn, telling Harry that if he shot him in the back, Harry would be charged with murder; and (7) within seconds after entering the barn, the defendant emerged with the shotgun and shot Harry as he was running away. From that evidence, a rational trier of fact could infer that (1) the defendant knew

18

that the unloaded shotgun was in the barn, (2) at some point the defendant loaded the shotgun, and (3) the defendant entered the barn deliberately to arm himself with the now loaded shotgun with the intention to shoot and kill Harry. "[P]roof that a defendant committed potentially lethal acts with a total disregard for human life is sufficient to establish the intent element of the offense of attempted first degree murder." *People v. Ryan*, 2023 IL App (2d) 220414, ¶ 12. Viewing the evidence in the light most favorable to the State, a rational trier of fact could have found that the defendant intended to kill Harry.

¶ 54                                                    C. Burglary

¶ 55    The defendant next contends that the State failed to prove that he entered the barn on Harry's property with the intent to commit a felony therein. The defendant first argues that there was no evidence to support a finding that he intended to a commit a felony *inside* the barn; rather, he maintains that he simply entered the barn to arm himself in response to a confrontation that was occurring *outside* the barn.

¶ 56    To support a burglary conviction, the State must prove beyond a reasonable doubt that a defendant, without authority, knowingly entered a building with the intent to commit therein a felony or theft. 720 ILCS 5/19-1(a) (West 2020). "Burglary is accomplished the moment an unauthorized entry with the requisite intent occurs regardless of whether a subsequent felony or theft was actually committed." *People v. Murphy*, 2017 IL App (1st) 142092, ¶ 10. The requisite intent, prior to entry, is required to uphold a burglary conviction. *People v. Powell*, 224 Ill. App. 3d 127, 138 (1991). "A criminal intent formulated after lawful entry will not satisfy the statute." *Id.* "Intent is usually proven through circumstantial evidence, that is, inferences based upon defendant's conduct." *Murphy*, 2017 IL App (1st) 142092, ¶ 10.

¶ 57    The defendant's argument is unavailing. As previously detailed, there was sufficient

evidence established at trial with which a rational trier of fact could infer that the defendant entered the barn with the intention of arming himself with a loaded shotgun with the intention to shoot and kill Harry. Furthermore, unlike Harry, the defendant did not fire a warning shot. He did not announce that he now was armed and would wait for the police. Instead, once the defendant had retrieved the loaded shotgun, he immediately aimed it at Harry and pulled the trigger. Later, when police discovered the discarded single-shot shotgun in Harry's yard, it contained one live 20-gauge shell in the chamber from which the trial court could infer that the defendant had reloaded after he shot Harry the first time.

¶ 58    Next, the defendant argues that the trial court erred because the charge of burglary was not supported by an underlying felony as required by the statute. Specifically, the defendant asserts that, contrary to the trial court's statement, theft of property valued in excess of $300 is not a felony; instead, the value of the property must exceed $500 to be a felony. 720 ILCS 5/16-1(b)(1) (West 2020). The fact that the trial court misspoke or incorrectly identified the requisite value of the property to support a charge of felony theft is of no consequence. Here, the defendant was convicted of both aggravated discharge of a firearm and attempted first degree murder, either of which supported the conviction of burglary.

¶ 59    We conclude, after viewing the evidence in the light most favorable to the State, that a rational trier of fact could have found the essential elements of burglary beyond a reasonable doubt. *People v. Brown*, 2013 IL 114196, ¶ 48. Because we find this argument dispositive, we decline to address the defendant's remaining arguments on this issue.

¶ 60                    D. Ineffective Assistance of Counsel Claims

¶ 61    The defendant asserts that trial counsel was ineffective for (1) failing to raise "necessity" as an affirmative defense to the charges of burglary and possession of a stolen motor vehicle,

20

(2) failing to object to inadmissible evidence at trial, and (3) failing to impeach Harry with his prior inconsistent statement to Sheriff Suits. The State correctly notes that the defendant forfeited his claims of ineffective assistance of trial counsel on appeal because he did not raise them at trial nor in his posttrial motion. See *Jackson*, 2022 IL 127256, ¶ 15 (to preserve an issue for appellate review, defendant must object to the alleged error when it occurs and raise the issue in a posttrial motion). However, we will address the defendant's claims that successor counsel was ineffective for failing to raise trial counsel's alleged deficient representation in his motion for a new trial. Additionally, the defendant asserts that trial counsel was ineffective for failing to make an opening statement or closing argument. This issue was raised by successor counsel in the motion for a new trial, and the trial court found that trial counsel was not ineffective in his representation of the defendant and that the defendant's sixth amendment right to counsel was not violated. Thus, because the defendant does not argue that the trial court erred, the issue is not properly before us.

¶ 62    A defendant's claim of ineffective assistance of counsel is analyzed under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Veach*, 2017 IL 120649, ¶ 29. To prevail on a claim of ineffective assistance of counsel, "a defendant must show that counsel's performance was (1) deficient and (2) prejudicial." *People v. Westfall*, 2018 IL App (4th) 150997, ¶ 61. To establish counsel's deficient performance, a defendant must show that "counsel's performance 'fell below an objective standard of reasonableness.' " *People v. Valdez*, 2016 IL 119860, ¶ 14 (quoting *Strickland*, 466 U.S. at 688). To establish prejudice, a defendant must show that a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Evans*, 209 Ill. 2d at 219-20 (citing *Strickland*, 466 U.S. at 694). "Failure to satisfy either prong negates a claim of ineffective assistance of counsel." *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 88.

¶ 63    It is the defendant's burden to overcome the strong presumption that defense counsel rendered adequate assistance using reasonable professional judgment pursuant to sound trial strategy. *Strickland*, 466 U.S. at 689-90. Whether trial counsel provided effective assistance is a mixed question of fact and law. *People v. Davis*, 353 Ill. App. 3d 790, 794 (2004). Therefore, a reviewing court will defer to a trial court's findings of fact but will make an independent judgment about the ultimate legal issue. *Id.* "We review *de novo* whether counsel's omission supports an ineffective assistance claim." *Id.*

¶ 64    The defendant argues that although trial counsel asserted the affirmative defense of compulsion to the charge of possession of a stolen motor vehicle, he was, nevertheless, ineffective for failing to assert the affirmative defense of necessity to the charges of burglary and possession of a stolen motor vehicle resulting in convictions for conduct that was permitted by law. The defendant maintains that successor counsel was ineffective for failure to raise the issue of trial counsel's deficient performance in his motion for a new trial.

¶ 65    "To properly raise an affirmative defense, a defendant is required to present some evidence on the issue, unless the State's evidence itself raises the defense." *People v. Crowder*, 2018 IL App (1st) 161226, ¶ 23 (citing *People v. Kite*, 153 Ill. 2d 40, 44-45 (1992)). " 'Generally, the quantum of proof necessary to raise an affirmative defense is evidence sufficient to raise a reasonable doubt as to defendant's guilt or innocence,' which is a relatively low threshold." (Internal quotation marks omitted.) *Id.* (quoting *Kite*, 153 Ill. 2d at 44). The affirmative defense of compulsion is a defense distinct from necessity as it "generally requires an impending imminent threat of great bodily harm together with a demand that the person perform a specific criminal act for which he is eventually charged." (Internal quotation marks omitted.) *People v. Roberson*, 335 Ill. App. 3d 798, 801-02 (2002).

22

¶ 66     Here, the defendant correctly notes that compulsion was not a viable defense because there was no demand that he commit a criminal act. However, he maintains that the affirmative defense of necessity was a viable defense where it was necessary for him to "adequately defend himself and safely flee from his assailant." Although the defendant concedes that he was trespassing on Harry's property, he argues that Harry did not have the right to "threaten his life with a gun"; once that happened, Harry became the "wrongdoer," and the defendant was left to choose from two evils—suffer the potentially fatal consequences of Harry's unlawful threats or arm himself in self-defense.

¶ 67     The affirmative defense of necessity does not require the defendant to show an imminent risk of harm. *Crowder*, 2018 IL App (1st) 161226, ¶ 33. "Rather, to establish a defense of necessity, the person claiming the defense (1) must be without blame in occasioning or developing the situation and (2) must have reasonably believed that his conduct was necessary to avoid a greater public or private injury than that which might have reasonably resulted from his own conduct." *Id.*

¶ 68     The record before us is devoid of any evidence suggesting that the defendant was without blame in occasioning or developing the situation. Although the defendant purportedly entered Harry's property in search of assistance because his vehicle was stuck, the defendant failed to do the one thing he could have done under those circumstances: knock on Harry's door to ask for help. Instead, the defendant escalated the situation when he went from merely trespassing on Harry's property to entering Harry's barn to retrieve the loaded shotgun with which he shot Harry. On the facts before us, the defendant's argument that he had no choice but to shoot Harry and flee on the stolen four-wheeler is farcical. Hence, because the affirmative defense of necessity was not

23

established, there was no ineffective assistance of either trial counsel for failure to raise it at trial or successor counsel for failing to raise it in the motion for a new trial.

¶ 69     The defendant next alleges trial counsel's ineffective assistance for failing to object to inadmissible hearsay evidence regarding the severity of Harry's injuries; thus, successor counsel was also ineffective for not raising these claims in the posttrial motion. The defendant maintains that two witnesses relayed statements attributed to non-testifying medical professionals regarding the severity of Harry's injuries. Specifically, Xennia testified that Harry had to be transferred to another hospital because the doctors at the first hospital believed his injuries were too severe to be treated locally and that a delay in seeking treatment would put Harry's life at risk. Sheriff Suits similarly testified that medical professionals believed that Harry had to be transferred because his injuries were "life threatening." The defendant posits that because no medical professional testified at trial, a timely objection to the hearsay evidence offered by Xennia and Sheriff Suits would have removed from consideration any medical opinion testimony that Harry had suffered life-threatening injuries.

¶ 70     Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). Hearsay generally is not admissible unless it falls within a recognized exception. *People v. Cloutier*, 178 Ill. 2d 141, 154 (1997). Given the context of the statements, we do not find that Xennia's statements were offered for the truth of the matter asserted; rather, her statements served to explain why Harry had to be transferred by helicopter to a hospital in another state. However, we do find that Sheriff Suits' testimony, taken in context, regarding Harry's "life-threatening injuries" was offered for the truth of the matter asserted, and thus was inadmissible hearsay that did not fall within a recognized exception.

24

¶ 71    On review of a bench trial, a reviewing court presumes that the trial court considered only properly admitted evidence unless the record affirmatively rebuts that presumption. *People v. Oglesby*, 2016 IL App (1st) 141477, ¶ 261. The trial court heard evidence that after he was shot, Harry was transferred to a local hospital by ambulance, only to then be transferred by a medical helicopter to an out-of-state hospital where he spent time in the trauma intensive care unit. Additionally, the trial court saw photographs, which had been properly admitted into evidence, depicting the extent of Harry's injuries. The defendant's argument that he was prejudiced by trial counsel's failure to object to this evidence is unpersuasive where he fails to point to anything in the record that affirmatively rebuts the presumption that the trial court considered only properly admitted evidence. Accordingly, we conclude there was no ineffective assistance of either trial counsel for failure to raise it at trial or successor counsel for failing to raise it in the motion for a new trial.

¶ 72    The defendant next argues trial counsel's representation was deficient for his failure to object to inadmissible trial testimony that the defendant had asked for an attorney after being advised of his rights; he argues that successor counsel failed to provide effective assistance for failing to raise the issue in the posttrial motion. The defendant maintains that when the State introduced evidence from the two police officers that he had asserted his right to remain silent and right to an attorney, his trial counsel should have objected. He further maintains that he was prejudiced by trial counsel's failure to object because his post-arrest silence was permitted to be used against him as substantive evidence of guilt on both occasions.

¶ 73    Once a defendant has been informed of his *Miranda* rights and chooses to remain silent, the use of his silence violates the due process clause of the fourteenth amendment of the United States Constitution. *Doyle v. Ohio*, 426 U.S. 610, 619 (1976); *People v. Dameron*, 196 Ill. 2d 156,

163 (2001). Here, the defendant cannot satisfy the prejudice prong of *Strickland* because nothing in the record suggests that the trial court relied on the defendant's post-arrest silence. See *People v. Titone*, 115 Ill. 2d 413, 423-24 (1986) (reviewing court did not consider whether a *Doyle* violation occurred in a bench trial because the trial court " 'is presumed to have considered only properly admitted evidence and defendant was not prejudiced' " (quoting *People v. Eddmonds*, 101 Ill. 2d 44, 66 (1984))).

¶ 74    The defendant concedes that ordinarily there is a rebuttable presumption that the trial court knew the law and applied it correctly. However, he argues, this presumption is rebutted by the record showing that the trial court erred in misstating the property value required to support a charge of felony theft ($300 instead of $500); erred in finding him guilty of attempted murder and burglary despite the fact that the State did not prove he acted with intent; and erred in finding the defendant guilty without considering his affirmative defenses. The presumption is further rebutted, he argues, because the trial court did not interject when the State elicited testimony from the two witnesses regarding his assertion of his constitutional right to remain silent. We note that the defendant fails to cite authority to support his argument that the trial court had a duty to interject with regard to the State's questioning. Although there are times when a trial court *may* interject, for example, to avoid repetitive or unduly harassing interrogation, "the court must always remain impartial and cannot assume the role of an advocate." *People v. Faria*, 402 Ill. App. 3d 475, 479 (2010). Accordingly, we conclude that the defendant failed to rebut the presumption that the trial court knew and correctly applied the law. Applying the presumption, and in light of the overwhelming evidence of the defendant's guilt, we do not find that the defendant's post-arrest silence was used against him as substantive evidence of guilt. Thus, we conclude that the

26

defendant's failure to establish prejudice negates his claim of ineffective assistance of either trial counsel or successor counsel.

¶ 75    The defendant next contends that trial counsel's performance was deficient for failing to introduce Sheriff Suits' written report in order to impeach an alleged prior inconsistent statement made by Harry. He also contends that successor counsel's representation was deficient because he did not raise the issue in a posttrial motion. Prior to sentencing, a presentence investigation report was filed which included, among other things, Sheriff Suits' narrative report. In his report, Sheriff Suits stated that he was able to speak to Harry for a few minutes during which time Harry stated that he shot at the defendant before the defendant fled on Harry's four-wheeler. The defendant posits that this case hinged on Harry's credibility, who testified at trial that the defendant shot him before he ever shot at the defendant. As the State correctly argues, this claim has no merit because trial counsel could not have attempted to impeach Harry with Sheriff Suits' written statement (see *People v. Shatner*, 174 Ill. 2d 133, 153 (1996)). "[Police] reports can only be used to impeach the officer who actually wrote the report." *People v. Gagliani*, 210 Ill. App. 3d 617, 629 (1991). Therefore, we conclude that trial counsel was not ineffective for failure to introduce Sheriff Suits' report, and successor counsel was not ineffective for failing to raise the issue in a posttrial motion.

¶ 76    Finally, the defendant argues that the cumulative effect of both trial counsel and successor counsel's errors establish that the defendant was denied his right to the effective assistance of counsel. The defendant maintains that successor counsel was equally ineffective for failing to identify these issues and raise them as cumulative error in his motion for a new trial. The State responds by arguing that although cumulative error may deprive a defendant of a fair trial, there must first be a showing of individual error. *People v. Garmon*, 394 Ill. App. 3d 977, 991 (2009).

¶ 77    Here, the defendant failed to show that any of the alleged errors of trial counsel were so egregious that he did not function as counsel guaranteed by the sixth amendment. Nor has the defendant demonstrated that there is a reasonable probability that, but for counsel's errors, the results of the proceeding would have been different. Thus, the defendant has failed to show that successor counsel was ineffective for not raising trial counsel's alleged errors in his motion for a new trial. Therefore, the defendant's claim of cumulative error fails.

¶ 78                                E. Sentencing Issues

¶ 79    The defendant contends that his 40-year sentence for attempted first degree murder should be vacated because he acted under "serious provocation" when he shot Harry. The defendant further contends that successor counsel was ineffective for failure to argue "serious provocation" at the sentencing hearing and failure to file a motion to reconsider the sentence. While the defendant concedes that he forfeited the issue for appeal purposes, he seeks review of the issue under either the plain-error doctrine or, in the alternative, as a claim for ineffective assistance of successor counsel.

¶ 80    A defendant forfeits appellate review of sentencing issues not raised in the trial court through both a contemporaneous objection and a timely filed, written postsentencing motion. *People v. Hillier*, 237 Ill. 2d 539, 544 (2010). Where the defendant has forfeited review of a sentencing issue, the reviewing court will consider only plain error. *Id.* at 545. The plain-error doctrine allows a reviewing court to remedy a "clear or obvious error" in two circumstances: (1) where the evidence in the case is so closely balanced that the guilty verdict may have resulted from the error and not the evidence; or (2) where the error is so serious that the defendant was denied a substantial right, and thus denied a fair trial. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). The first step in the plain-error analysis is to determine whether error occurred at all.

28

*People v. Harris*, 225 Ill. 2d 1, 31 (2007). Where there is no error, there can be no plain error. *People v. Hood*, 2016 IL 118581, ¶ 18.

¶ 81    The attempt statute provides for two different sentences for attempted murder, depending on the circumstances of the crime. 720 ILCS 5/8-4(c)(1) (West 2020). A Class X sentence if no mitigating circumstances are present, and a Class 1 sentence if the crime was the product of "serious provocation":

> "(E) if the defendant proves by a preponderance of the evidence at sentencing that, at the time of the attempted murder, he or she was acting under a sudden and intense passion resulting from serious provocation by the individual whom the defendant endeavored to kill, or another, and, had the individual the defendant endeavored to kill died, the defendant would have negligently or accidentally caused that death, then the sentence for the attempted murder is the sentence for a Class 1 felony[.]" *Id.* § 8-4(c)(1)(E).

¶ 82    "Serious provocation" is defined, in pertinent part, as "conduct sufficient to excite an intense passion in a reasonable person." *Id.* § 9-2(b). We note that the phrase "serious provocation" has been defined the same in both section 8-4(c)(1)(E) and the second degree murder statute (*id.* § 9-2(a)(1)). See *People v. Harris*, 2013 IL App (1st) 110309, ¶ 13. Illinois has recognized four categories of serious provocation: (1) substantial physical injury or substantial physical assault, (2) mutual quarrel or combat, (3) illegal arrest, and (4) adultery with the offender's spouse. *People v. McDonald*, 2016 IL 118882, ¶ 59. "Mere words and gestures are insufficient to constitute serious provocation." *People v. Campbell*, 2012 IL App (1st) 101249, ¶ 49.

¶ 83    The defendant argues that this case implicates the first two categories—substantial physical assault and mutual quarrel or combat. He notes that the phrase "substantial physical assault" is not defined by either the statute or case law and urges this court to find that Harry's acts of pointing a

gun at him and firing a warning shot in his direction while his back was turned was a substantial physical assault which provoked him to "return fire." He further posits that Harry's actions were intended to place him in reasonable apprehension of receiving a battery with a firearm; thus, he argues that Harry's threatened battery constituted a "substantial physical assault." Although he did not raise the issue in a postsentencing motion, successor counsel argued at the sentencing hearing that Harry's actions should serve to mitigate the defendant's sentence and reiterated that the defendant was acting in self-defense.

¶ 84    We need not define the phrase "substantial physical assault" because, contrary to the defendant's argument, a rational trier of fact could conclude that he was not in reasonable apprehension of receiving a battery with a firearm. Although Harry was pointing his gun at him, it was the defendant who continued to approach after he had been discovered on Harry's property, causing Harry to continue to back up in an attempt to keep distance between them. It was the defendant who turned his back on Harry, who was still holding his gun, as he walked towards the barn to retrieve Harry's shotgun. Finally, as the defendant was walking towards the barn, he told Harry that he would be charged with murder if he shot the defendant in the back. Here, the evidence was sufficient for the trial court to infer that the defendant did not experience a substantial physical assault such that he was acting under a "sudden and intense passion resulting from serious provocation" by Harry. It is the duty of the trier of fact to resolve any discrepancies in the evidence (*Evans*, 209 Ill. 2d at 211), and they are not required to abandon common sense when doing so.

¶ 85    The defendant next argues that he was acting under a "sudden and intense passion resulting from serious provocation" due to mutual combat. "Mutual combat is a fight or struggle that both parties enter willingly or where two persons, upon a sudden quarrel and in hot blood, mutually fight upon equal terms and where death results from the combat." *McDonald*, 2016 IL 118882,

30

¶ 59. Here, there was no evidence of mutual combat prior to the defendant shooting Harry as he was running away. Nor does the defendant argue on appeal what acts constituted mutual combat. He merely reiterates that Harry's "substantial assault" provoked a response which prompted the defendant to arm himself with Harry's gun and return fire with a single shot of "non-lethal" birdshot. Under the facts of the instant case, there is no evidence that the defendant acted under serious provocation, and, thus, the defendant has failed to meet his burden of establishing plain error (where there is no error, there can be no plain error (*Hood*, 2016 IL 118581, ¶ 18)).

¶ 86　Furthermore, where there was no evidence to support the defendant's argument that he acted under serious provocation, the defendant cannot establish ineffective assistance of successor counsel for failure to raise the issue in a postsentencing motion. See *People v. Bowen*, 2015 IL App (1st) 132046, ¶ 28 (counsel need not make futile motions in order to provide effective assistance). Accordingly, we find that the defendant's claim to be without merit.

¶ 87　The defendant next argues that the 40-year sentence (served at 85%) he received for attempted murder is excessive and/or unconstitutional because he could not have been sentenced in excess of 20 years (served at 50%) had the homeowner been killed as a result of the defendant's sincere but "misplaced" belief that lethal force was necessary to save his own life. The defendant concedes that this issue was forfeited but seeks review under the plain-error doctrine, or, alternatively, as a claim of ineffective assistance of counsel. Thus, we will engage in the first step in the plain-error analysis and determine whether error occurred at all. *Harris*, 225 Ill. 2d at 31.

¶ 88　A defendant commits second degree murder when he commits first degree murder and one of the following mitigating factors exists: (1) the defendant acted under an unreasonable belief of self-defense, and (2) at the time of the killing, the defendant acted "under a sudden and intense passion resulting from serious provocation by the individual killed." 720 ILCS 5/9-2(a)-(b) (West

31

2020). The statute defines "serious provocation" as "conduct sufficient to excite an intense passion in a reasonable person." *Id.* § 5/9-2(b).

¶ 89    The crux of his argument is that had Harry died, the defendant could have been convicted only of second degree murder based on his unreasonable belief in his right to self-defense. As proof of this mitigating factor, the defendant once again asserts that the trial court found he had a sincere, albeit misplaced, belief that lethal force was necessary to save his own life which served as a mitigating factor to the charge of first degree murder. As previously noted, the trial court's comment was made in response to the defendant's statement in allocution at the sentencing hearing after the defendant had been found guilty. This was not a trial court finding made during the course of the trial. As further evidence that the trial court made no such finding, the record reveals that during sentencing the trial court told the defendant he was lucky not to be facing a first degree murder charge based on the evidence of Harry's injuries. Thus, to the extent that the defendant relies on the trial court's comment made during the sentencing hearing, his argument fails.

¶ 90    Hence, because there was no finding of a mitigating factor, the defendant's sentence following his conviction of attempted first degree murder was not excessive and there was no error. Where there is no error, there can be no plain error. *Hood*, 2016 IL 118581, ¶ 18. Additionally, successor counsel was not ineffective for failure to raise this argument in a postsentencing motion because it would have been futile to do so. *Bowen*, 2015 IL App (1st) 132046, ¶ 28.

¶ 91    The defendant next contends that his 40-year sentence for attempted first degree murder violates the eighth amendment to the federal Constitution, the proportionate penalties clause to the Illinois Constitution, and the equal protection clauses to both constitutions. Because the defendant's arguments are premised on the baseless claim that the trial court found the defendant

had an unreasonable belief in self-defense based on statements the trial court made during the sentencing hearing, those arguments fail as well.

¶ 92    The defendant next contends that his 40-year sentence for attempted first degree murder was excessive given his military record, his limited criminal history, his family support, and the "extremely mitigated nature" of the crime. He submits the trial court was obligated to impose a sentence that had the greatest potential for restoring him to a useful and productive place in society while also punishing him for his misconduct and safeguarding the public from further offenses. See *People v. Mick*, 86 Ill. App. 3d 1022, 1030 (1980).

¶ 93    The Illinois Constitution requires courts to determine penalties " 'both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship.' " *People v. Bien*, 277 Ill. App. 3d 744, 755 (1996) (quoting Ill. Const. 1970, art. I, § 11). "Not *all* criminal defendants must be given an opportunity for rehabilitation or else life imprisonment would not be constitutionally permissible." (Emphasis in original.) *Id.* at 756. The trial court is vested with the responsibility for balancing between rendering justice and rehabilitating the defendant. *Id.* A defendant's rehabilitative potential is not entitled to greater weight by the trial court than the seriousness of the offense. *Id.* "The goal of rehabilitation should not be elevated over the goal of justice." *Id.*

¶ 94    "The trial court has broad discretionary powers in imposing a sentence, and its sentencing decisions are entitled to great deference." *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). Because the trial court had the opportunity to weigh such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age, a reviewing court must not substitute its judgment for that of the trial court merely because it would have weighed these factors differently. *Id.* at 213. If a sentence is within statutory limits, a reviewing

33

court will not reverse it absent an abuse of discretion. *People v. Cabrera*, 116 Ill. 2d 474, 494 (1987). A trial court abuses its discretion when the penalty imposed is "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *People v. Stacey*, 193 Ill. 2d 203, 210 (2000).

¶ 95    In the instant case, the defendant was convicted of attempted first degree murder which carries a sentence of imprisonment of not less than 6 years and not more than 30 years. 730 ILCS 5/5-4.5-25(a) (West 2020). In addition, because the trial court found that the defendant personally discharged a firearm that proximately caused great bodily harm to another person, the defendant was subject to an additional sentence of 25 years or to natural life. *Id.* § 5-8-1(a)(1)(d)(iii). At the sentencing hearing, Harry testified that approximately 60 shotgun pellets remained lodged in his body, with one of the pellets still lodged in his kidney. Prior to imposing sentence, the trial court considered all the evidence in aggravation and mitigation, the presentence investigation report, and the defendant's statement in allocution. The trial court sentenced the defendant to 15 years of imprisonment for attempted first degree murder, and an additional 25 years for the firearm enhancement. Thus, the defendant's 40-year sentence was well within the statutory limits. We do not find that the trial court abused its discretion in imposing sentence.

¶ 96                                III. Conclusion

¶ 97    For the foregoing reasons, we affirm the defendant's conviction and sentence.


¶ 98    Affirmed.